UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHAWN MURPHY,

                    Plaintiff,

        v.                                    Case No. 16-cv-1462-pp

NICOLE KAMPHUIS, JAMES MUENCHOW,
CARLA HARTMAN, BRIAN FOSTER,
STEVEN SCHMIDT, KRISTINA DEBLANC
and WISCONSIN DEPARTMENT OF CORRECTIONS,

                    Defendants.

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 60), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 67), DENYING PLAINTIFF'S MOTION TO COMPEL DISCOVERY (DKT. NO. 94), DENYING AS MOOT PLAINTIFF'S MOTION FOR STATUS OF CASE (DKT. NO. 107) AND DISMISSING CASE**

        Plaintiff Shawn Murphy is a state prisoner representing himself. He filed an amended complaint, alleging that the defendants violated his rights under the Americans with Disabilities Act (ADA) and the Rehabilitation Act, and asserting that they denied him access to the courts. Dkt. No. 21. On June 11, 2018, the court screened the amended complaint and allowed the plaintiff to procced on the following claims: (1) that defendants Muenchow, Kamphuis and Foster repeatedly failed to make reasonable accommodations for the plaintiff's disabilities, resulting in a lack of meaningful access to the courts, in violation of the ADA and the Rehabilitation Act; (2) that defendants Schmidt and DeBlanc failed to contact the ADA Coordinator to get the plaintiff help for his disability, in violation of the ADA and the Rehabilitation Act; and (3) that

1

defendants Kamphuis, Muenchow and Hartman denied the plaintiff access to the courts when they denied his requests for accommodations and denied his request for a legal loan, resulting in his inability to petition the Wisconsin Supreme Court regarding his criminal case. Dkt. No. 30 at 8-9.

The plaintiff has filed a motion for summary judgment, dkt. no. 60, as have the defendants, dkt. no. 67. Before turning to the summary judgment motions, the court addresses the parties' filings regarding the plaintiff's third request for production of documents.

## I. Defendants' Response to Court's September 16, 2019 Order (Dkt. No. 91) and Plaintiff's Motion to Compel (Dkt. No. 94)

On September 16, 2019 the court granted the plaintiff's motion regarding the defendants' response to the plaintiff's third request for production of documents. Dkt. No. 88 at 15-17. The court directed the defendants to file a response indicating whether they had provided the plaintiff with the documents he sought in paragraph 2 of his third request for production of documents. Id. at 17. Paragraph 2, and the defendants' initial response to the request, states:

> 2. Because one defendant is the Department of Corrections I request all document pertaining to my mental health or treatment from 12/2000 through 12/2013. Unit 713, 273 S. 17th Av. West Bent, WI 53095—
>
> > -Records of ADA testing and being qualified person under 42 USCG 12131 for a program by the Department of Workforce Development/Division of Vocational Rehabilitation for train 2003 through 2005,
> >
> > And two physicians' disability reports given to probation in 2011 from Dr. Tucker and Dr. Horowitz my providers at the time

What documents WCI has in it possession is not the limiting factor in the request under Federal Rules of Civil Procedure Rule 26(b)(1) I have a right to all documents 'relevant' to my claim.

That I was on probation with the Department of Corrections/Division of Community Corrections 12/2000 through 12/2013 means I was I coustity [sic] of the DOC so all requested documents are 'relevant' 100%.

RESPONSE: Defendants have requested, but not yet received, Plaintiff's psychological records from DOC. This response will be supplemented after receipt and review of the records.

Dkt. No. 87 at 32-33.

On October 10, 2019 the defendants filed a letter stating that they had provided documents to the plaintiff on September 17, 2019, per the court's order at Dkt. No. 88. Dkt. No. 91 at 1.[1] The defendants attached a cover letter and amended discovery response pleading, and they reference the documents, PSU 001-736, which they say they mailed to the plaintiff. Id. at 1-2.

On October 17, 2019, the plaintiff filed a motion to compel discovery; he said that the defendants did not provide the documents he requested. Dkt. No. 94 at 3. The defendants' supplemental response, however, contains over 700 pages from the plaintiff's Wisconsin Department of Corrections (DOC) psychological file. Dkt. No. 97 at 2. To the extent that paragraph 2 of the plaintiff's third request for production of documents requested other documents, the defendants explain that they previously had provided the plaintiff with the records he requested from Dr. Tucker and Dr. Horowitz. Id.

---

[1] The court ordered the defendants to file their response within fourteen days, or by September 30, 2019. The defendants filed their response ten days late. Dkt. No. 88 at 17.

They state that they do not have the "2003-2005 DWD/DVR records" the plaintiff requests. Id. The plaintiff says he wants all his medical records from 2000-2013 and that he was on probation during this time, so he was in the "custody" of the DOC. Dkt. No. 94 at 2. But the defendants state that to the extent the plaintiff received medical or mental health treatment from a non-DOC provider in periods during 2000 to 2013 when he was not in custody, the records of that treatment would not be DOC records. Dkt. No. 97 at 2. The defendants also explain that they provided the plaintiff with a courtesy copy of the Washington County Mental Health records from the plaintiff's DOC medical file. Id.

The defendants have provided the documents the plaintiff requested, to the extent that they had them. In response to paragraph 2 of the plaintiff's third request for production of documents, the defendants have provided the plaintiff with his DOC psychological records. In response to the plaintiff's motion to compel, the defendants have explained why they did not provide the plaintiff with documents other than his DOC psychological file. The court notes that the plaintiff's motion to compel did not comply with this court's local rules; the plaintiff did not certify that he contacted defense counsel to try to work out his discovery issue before filing his motion to compel. See Fed. R. Civ. P. 37(a); Civil Local Rule 37 (E.D. Wis.). Even if the plaintiff had complied with the rule, however, the court would deny the motion because the defendants have provided the plaintiff with the records they have—his DOC psychological file—in response to the discovery request.

**II.    Plaintiff's Motion for Summary Judgment (Dkt. No. 60) and Defendants' Motion for Summary Judgment (Dkt. No. 67)**

The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c). The court primarily includes the defendants' proposed findings of fact, dkt. no. 69, because the plaintiff hasn't identified any material disputes with those facts. See Dkt. No. 83. The plaintiff's proposed facts cite to various exhibits (most of which the defendants included in their summary judgment materials) and the court has attempted to locate the exhibits for verification purposes. See Dkt. No. 62. To the extent the court was unable to locate an exhibit referenced in the plaintiff's proposed facts, the court has relied on the defendants' response which corroborated the contents of the exhibit. See Dkt. No. 93.

A.    Facts

1.    *Parties*

During the events the plaintiff described in the amended complaint, he was incarcerated at the Waupun Correctional Institution. Dkt. No. 69 at ¶1. The plaintiff received his High School Equivalency Degree (HSED) in 1991 and an associate's degree in engineering in 1993; based on 2014 testing, his IQ was in the low average range. Id. at ¶2. He has an associate's degree in electrical engineering. Id. at ¶3.

Defendant Brian Foster is the Warden at Waupun. Id. at ¶4. He has held this position since January 10, 2016 and has been employed by the State of Wisconsin since July 2010. Id. Defendant Carla Hartman was employed at Waupun as the "Business Office Secretary-Confidential" from July 17, 2011 to

August 21, 2016. Id. at ¶5. Defendant Nicole Kamphuis was employed at Waupun as a financial program supervisor from November 7, 2010 to October 29, 2017 and acted as ADA Coordinator at times. Id. at ¶6. Defendant Dr. Kristina DeBlanc is employed by the DOC as a psychological associate in the Psychological Services Unit (PSU) at Waupun. Id. at ¶7. Defendant Dr. Steven Schmidt is a psychologist and has been licensed in the State of Wisconsin continuously since May of 2004. Id. at ¶8. He was the PSU supervisor at Green Bay Correctional Institution (Green Bay) from June 2005 until November 2015. Id. at ¶8. He transferred to Waupun as the PSU supervisor on November 15, 2015 and held the position until October 2017. Id. Defendant James Muenchow is an institution complaint examiner at Waupun; he's been an Institution Complaint Examiner (ICE) since 1998. Id. at ¶9.

2. *Legal Loans*

When Hartman was employed at Waupun, one of her duties was to administer the institution inmate legal loan program. Id. at ¶10. Inmate legal loan procedures are determined by Division of Adult Institutions (DAI), Policy and Procedures 309.51.01. Id. at ¶10. The criteria considered when determining loan eligibility includes earnings, receipts, spending patterns, pending litigation, estimate of cost, history of repayment and current legal supplies. Id. at ¶11.

The plaintiff obtained legal loans for the appeal of State of Wisconsin v. Shawn D. Murphy, Washington County Case No. 00-CF-156 and some Dodge County civil cases on May 15, 2014 and January 2, 2015. Id. at ¶12. On May

15, 2014, Hartman approved a legal loan for up to $100 and summarized the approved legal supplies and allowable amounts. Id. at ¶13. On December 28, 2014, the plaintiff applied for a loan for Case Number 00-CF-156 and indicated that no court deadlines existed; he was waiting for a decision. Id. at ¶14. On January 2, 2015, Hartman approved a legal loan for up to $50 for all the plaintiff's 2015 legal loans. Id. The plaintiff also obtained a legal loan for filing/appealing of inmate complaints on February 9, 2015. Id. at ¶15. He filed for another legal loan for inmate complaints on March 19, 2015. Id. On March 20, 2015, Hartman noted the loan already had been approved. Id.

On March 16, 2015, Hartman issued the plaintiff a warning for misuse of legal supplies because he had said that he wanted to send an inmate complaint form to the Dane County Circuit Court even though he didn't have a pending Dane County case. Id. at ¶16. On March 30, 2015, Hartman suspended the plaintiff's legal loan for misuse, following that warning. Id. at ¶17. The legal loan policy provides that a misuse warning is given and then suspension occurs. Id.

On April 27, 2015, the plaintiff submitted a legal loan application for the filing of a petition for certiorari but didn't give a deadline. Id. at ¶18. On May 12 and 13, 2015, the plaintiff again submitted legal loan applications for the filing of a certiorari petition and again, provided no deadlines. Id. at ¶19. On August 25, 2015, the plaintiff submitted a legal loan application for filing a petition for review to the Wisconsin Supreme Court. Id. at ¶20. Hartman denied

the loan, noting that the judgment of conviction had been affirmed and request for extensions of time denied. Id.

>    3.    *The Plaintiff's Appeal Regarding Washington County Case Number 00-CV-156*

On October 31, 2014, Attorney Michelle Velasquez filed a "No Merit Report," concluding there was no basis for challenging the sentence imposed after the revocation of the plaintiff's parole. [2] Id. at ¶101. On January 2, 2015, the plaintiff filed a "No Merit Response." Id. On March 11, 2015, the court of appeals issued a summary disposition affirming the judgment of conviction and relieving Attorney Michelle Velasquez from representing the plaintiff. Id.

On March 19, 2015, the plaintiff filed a motion for reconsideration, which was denied on March 20, 2015. Id. at ¶102. On March 25, 2015, the plaintiff filed a letter asking for more time to file another motion for reconsideration. Id. at ¶103. On May 21, 2015, the plaintiff filed a motion for miscellaneous relief. Dkt. No. 77-1 at 2. The court of appeals denied the motion with a notation that the "30-day period in which to file a petition for review may not be enlarged." Id. On November 8, 2018, the plaintiff filed a motion for miscellaneous relief. Id. at 1. The next day, the court of appeals denied the motion, and stated in part:

>    The June 11, 2018 order, in which the court of appeals declined to take action on Mr. Murphy's motion, is not subject to supreme court

[2] The Washington County Circuit Court docket indicates that after the plaintiff's supervision was revoked and he was convicted, Assistant State Public Defender Michelle Velasquez was the person who received the record for appeal. State v. Shawn D. Murphy, 2000CF000156 (Washington County), available at https://wcca.wicourts.gov. It appears that ASPD Velasquez represented the plaintiff from sometime in January 2014 until mid-2015.

review. The decision of the court of appeals that is subject to review in this court is the court of appeals' final decision disposing of the appeal or writ proceedings. . . . In this matter, the court of appeals' final decision was its decision of March 11, 2015, which summarily affirmed Mr. Murphy's judgment of conviction. A petition for review must be physically filed with the clerk of this court within 30 days after the date of the court of appeals' final decision . . . In addition, the motion may not be construed as a timely but nonconforming petition for review because more than 30 days have passed from the issuance of the court of appeals' decision of March 11, 2015, and more than 30 days have passed from the court of appeals' March 20, 2015 order denying the motion for reconsideration.

Dkt. No. 77-1 at 1.

From February 10, 2015 to March 23, 2015, the plaintiff used legal loans for postage for mailings regarding Case No. 00-CF-156 seven times. Id. at ¶104.

4. *ADA Coordinator*

As the ADA coordinator at Waupun, Kamphuis assisted with the Division of Adult Institutions (DAI), Policy and Procedures 300.00.35—Americans with Disabilities Act. Id. at ¶21. To be considered for an ADA accommodation, an inmate must fill out and sign a DOC-2530 form and forward it to Waupun's ADA coordinator for review. Id. at ¶22. If approved, the ADA coordinator will implement reasonable accommodations. Id. If the request is denied, an inmate can appeal the decision through the Inmate Complaint Review system. Id.

On May 6, 2014, the plaintiff submitted a DOC-2530 asking for help for his "case paper work." Id. at ¶23. Waupun does not provide inmates assistance with understanding or preparing lawsuits. Id. Because the plaintiff's request was not considered an acceptable ADA accommodation, Kamphuis denied it. Id.

On May 28, 2014, the plaintiff submitted a DOC-2530 asking for additional time in the law library due to learning disabilities and dyslexia. Id. at ¶24. On May 29, 2014, Kamphuis emailed Amy Reid, the education director, and asked if the plaintiff had any documented learning problems. Id. at ¶25. Ms. Reid responded that during intake at Dodge Correctional, the plaintiff had self-reported completing high school, and that there were no education needs and nothing to support the plaintiff's claims of a learning disability. Id. Kamphuis asked the plaintiff to provide documentation to support his claims of dyslexia and learning disabilities. Id.

On May 30, 2014, the plaintiff submitted an information request, explaining that he obtained his HSED and that the Division of Vocational Rehabilitation (DVR) paid for schooling. Id. at ¶26. On June 2, 2014, Kamphuis emailed Paul Ludvigson (PSU) and asked for "insight" into the plaintiff. Id. at ¶27. Kamphuis summarized the information she had received from Ms. Reid and requested additional information from the plaintiff, who claimed there was documentation in his PSU file regarding his disability. Id. On June 4, 2014, Ludvigson responded that he had skimmed the plaintiff's PSU file and that there was no professional dyslexia diagnosis, that the plaintiff had received his HSED in 1991 and his associate's degree in engineering in 1993, and that based on 2014 testing, his IQ was in the low average range. Id. at ¶28. On June 9, 2014, Kamphuis informed the plaintiff his DOC-2530 request for additional law library time was denied for the reasons provided by Ludvigson.

Id. at ¶29. Based on this information, the plaintiff did not qualify for an accommodation. Id.

On July 25, 2014, the plaintiff submitted an information request asking about getting more time in the law library because he had "cases going forward." Id. at ¶30. Kamphuis emailed Librarian Nevin Webster to ask what the plaintiff was asking about; Webster called Kamphuis. Id. at ¶31. Kamphuis understood that the matter was resolved because the plaintiff did not submit another DOC-2530 until April of 2015. Id.

On April 7, 2015 the plaintiff submitted another DOC-2530 for ADA accommodation. Id. at ¶32. On April 13, 2015, the plaintiff submitted an Interview/information Request (IIR) that said:

> I am filing this DOC-2530 for accommodation under the conting [sic] wrong rule, Heard v. Sheahan, 253 F.3d at 318. By the A.D.A. law I more then is needed to have accommodations. Under my ADA rights, U.S.C. §12101, the term "substantially limits" shall be interpreted consistently with the findings and purposes of the A.D.A. E) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as, IV) learned behavioral or adaptive neurological modifications.

Id. at ¶33.

On April 15, 2015, Kamphuis emailed Barbara Wulfers, Waupun's educational guidance counselor, and advised Wulfers that Kamphuis had been in contact with the plaintiff since May 8, 2014 about his claim of a learning disability. Id. at ¶34. There was no documentation proving he had a diagnosed learning disability, he had self-reported a 1991 HSED and 1993 associate's degree in engineering and Kamphuis had found nothing showing that he

qualified for ADA accommodations. Id. Kamphuis asked if Wulfers had any different information. Id. Wulfers responded that she had checked the WICS (Wisconsin Integrated Corrections System) database which showed no educational needs assigned to the plaintiff; Wulfers said that she also would review the plaintiff's file. Id. at ¶35. On April 22, 2015, Kamphuis emailed Wulfers, confirming her statements that there was no special education documentation in the plaintiff's file, that Waupun did not provide classes for legal work and that the plaintiff should work with his social worker regarding coping skills. Id. at ¶36. Because the plaintiff's situation did not involve an ADA issue, Kamphuis asked Wulfers to communicate with the plaintiff in her capacity as educational guidance counselor. Id.

On July 2, 2015, the plaintiff requested ADA accommodation for additional time in the law library. Id. at ¶37. Kamphuis responded to the plaintiff that this issue had been addressed back in February. Id. The other issues the plaintiff raised were not ADA accommodation issues. Id.

On September 21, 2015, the plaintiff asked for ADA accommodation for "legal help to get equal access to the courts." Id. at ¶38. Kamphuis had reviewed documents dated July 6, 2015 from the Social Security Administration that determined the plaintiff did not have a learning disability, that nothing had changed and that a dismissal was on file. Id. at ¶39.

On October 29, 2015, the plaintiff used a DOC-643 to ask for more DOC-2530 forms. Id. at ¶40. Kamphuis told the plaintiff she would not send him additional DOC-2530s unless he could provide new documentation. Id. The

plaintiff's previously submitted DOC-2530s had not asked for accommodations that could be provided under ADA, even if he did qualify. Id. at ¶41. Waupun does not provide assistance to inmates to perform their own legal work. Id. Kamphuis's memo to the plaintiff dated November 3, 2015 stated:

> I contacted Dr. Grin yesterday. She did state that you have a low IQ, but this was verified on a previous DOC-2530. I will not send you additional DOC-2530's unless you can provide new documentation. On the previous forms you have submitted, you have not requested any accommodations that could actually be provided (if it was determined that you would qualify for an accommodation). We are not stating that you may not have a learning disability. But even so, the institution does not help any inmate with legal issues. You are not requesting an accommodation to a program that exists for other inmates.

Dkt. No. 72-2 at 26.

On November 7, 2015, the plaintiff submitted a DOC-2530 to request additional law library time. Dkt. No. 69 at ¶42. Kamphuis found out that the plaintiff was not requesting the maximum amount of law library time available to him and that he had been observed wasting the library time he requested and received. Id. Based on this information, Kamphuis denied the request. Id.

On September 20, 2016, the plaintiff submitted a DOC-2530 to request "two library periods per pass back to back" but did identify any upcoming court deadlines. Id. at ¶43. Kamphuis denied his request because inmates may seek additional library time only when they have an upcoming court deadline. Id. Kamphuis also informed the plaintiff that caselaw printouts are not provided to inmates and that these printouts do not fall under the legal loan policy. Id. at ¶44.

On June 9, 2017, the plaintiff submitted a DOC-2530 to request additional law library time. Id. at ¶45. Kamphuis denied this request, indicating that she'd received and reviewed a June 20, 2017 court order for this case—Case No. 16-cv-1462—stating that the court understood the plaintiff's documents and had not deemed it necessary to appoint counsel.[3] Id. Kamphuis approved Carla Hartman's decision to suspend the plaintiff's legal loan for thirty days, which was based on documented and continued legal loan misuse. Id. at ¶46.

     5.    *PSU Involvement*

Exhibit 1005 (the court's Dkt. No. 76-1) to the declaration of Casey Schmude, the DOC records custodian for the PSU, includes seventy-seven pages of records from the plaintiff's PSU file (the whole file consists of 725 pages). Id. at ¶47. In addition to Exhibit 1005, the plaintiff's 725-page PSU file includes 315 pages of his handwritten correspondence and psychological service requests directed to the various providers. Id. at ¶48.

Dr. DeBlanc first met with the plaintiff for a session on June 26, 2017, for an emergency PSU contact at the plaintiff's request due to a death in the family, because the plaintiff's primary clinician was out of the institution for an unknown, extended period of time. Id. at ¶49. DeBlanc noted that the plaintiff changed the focus of this contact to complaints about needing special

---

[3] It appears Kamphuis was referring to Dkt. No. 15, in which the court granted the plaintiff's request to proceed without prepaying the filing fee, denied his motion to appoint counsel and denied his motion for relief of communications barriers.

accommodations because of "dyslexia." Id. at ¶50. DeBlanc agreed to review the plaintiff's file, given the absence of the plaintiff's primary physician, and found nothing in the plaintiff's PSU file demonstrating he had a dyslexia diagnosis or any confirmed learning disorders. Id. Beginning on June 26, 2017, someone decided that the plaintiff would temporarily be on DeBlanc's case load while the plaintiff's clinician was gone from the institution. Id. at ¶51. The plaintiff denied needing to work through the family death and appeared unsure why he was requesting mental health treatment. Id. at ¶52.

On September 13, 2017, DeBlanc noted that treatment goals would need to be short term in nature given that the plaintiff's clinician would be returning:

> I asked [the plaintiff], as he has continued to state to me that he wants more frequent sessions, what he would like to focus on/what he feels would be helpful in meeting more often. [The plaintiff] indicated that he is not sure how to deal with people and feels that meeting more often would be helpful so he can "release," and "talk." I encouraged [the plaintiff] to consider a specific goal or area for personal change, rather than seeing therapy simply as a place to "talk" with someone.

Id. at ¶53. Despite the plaintiff's apparent lack of a specific goal, he was also informed that DeBlanc would continue to provide clinical monitoring while the plaintiff's clinician was away from the institution. Id. at ¶54. A few months later, however, DeBlanc learned that the plaintiff's primary clinician would not be returning to the institution and that the plaintiff would be remaining on her caseload. Id. at ¶55. Between the months of September 2017 and December 2017, the plaintiff did not reach out to DeBlanc with an outlined treatment goal; instead, he wrote specifically about the circumstances he has described in

this lawsuit. Id. He made multiple complaints against the PSU regarding his belief that he was not receiving accommodations, which he perceived were required to assist him in completion of legal work. Id. at ¶56.

Given the extent of the plaintiff's behavior and continued complaints, DeBlanc consulted with many units within Waupun and decided to schedule an appointment where the plaintiff could meet with the PSU and the ADA coordinator for clarification purposes. Id. at ¶57. On December 5, 2017, DeBlanc had a session with the plaintiff; there were several reasons for the session, including the plaintiff's own request, clinical monitoring and a consult with the ADA coordinator. Id. at ¶58. Regarding the ADA, DeBlanc's purpose was "to assess general request for services, feasibility of said request and inquiry as to why [the plaintiff] believed he needed said accommodations." Id. DeBlanc also used this session to determine if further testing would be needed to learn whether the plaintiff had any learning disorders that would hinder his ability to do legal work to the level that accommodations would be necessary. Id. at ¶59. DeBlanc and the plaintiff were joined by ADA coordinator Amy Wilson. Id. at ¶60. The plaintiff outlined the accommodations he wanted (telephone calls, note-taker, more library time and extra legal materials allowed in his cell). Id.

DeBlanc explained in the "impressions" section of a February 8, 2018 psych services clinical contact report that the plaintiff previously had sent to the Health Services Unit testing results from 1975 (later obtained by the PSU)

indicating some learning challenges in his youth.[4] Id. at ¶61. The 1975 documentation outlined areas where the plaintiff had improved in school and showed an above average IQ score of 112. Id. at ¶62. Despite some documented deficits in achievement, the plaintiff had developed coping skills throughout his life and had been able to obtain an associate's degree in electrical engineering. Id. DeBlanc also referenced a psychological assessment completed at Dodge Correctional Institution in 2014 (prepared from six visits with the plaintiff) which indicated that the plaintiff's responses led to a "strong" suspicion of malingering mental health symptoms (over reporting, inconsistent reporting and atypical symptoms). Id. at ¶63. In this report of the psych assessment completed at Dodge (Dkt. No. 76-1 at 69-77), the authors noted that the plaintiff had received his HSED in 1991 and an associate's degree in engineering in 1993 and that he had made no mention of any perceived needs for further testing for learning deficits or of a dyslexia diagnosis. Id. at ¶64. The predominant diagnosis was personality disorders, secondary to persistent depressive disorder. Id.

After reviewing specific accommodation requests and the plaintiff's stated reasons for the requests, DeBlanc determined there was no evidence to suggest that a specific deficit in learning or general cognition was present at a level

---

[4] The actual proposed finding of fact says that "in this note" DeBlanc had explained about the 1975 testing results. They cite Exhibit 1005—Dkt. No. 76-1—at page 11 for this particular finding, so the court assumes that by "this note," the defendants mean a three-page psychological services clinical contact report signed by DeBlanc on February 8, 2018. Dkt. No. 76-1 at 11-13.

warranting further, more specialized psychological testing. Id. at ¶65.

DeBlanc's treatment plan was as follows:

> [The plaintiff] will be seen for clinical monitoring and per his request, if clinically indicated. After meeting with [the plaintiff] and consulting with psychological supervisor, social worker, legal and ADA coordinators, ICE investigators, and librarian staff, no further consideration is going to be made for requested ADA accommodation. Treatment to focus on gaining insight with his mental health disorders and finding more adaptive ways to approach level of anxiety and stress, presently presented in his severe OCD symptoms expressed. (Ex. 1005 at 13.)

Id. at ¶66.

According to DeBlanc, being diagnosed with a mental health disorder does not automatically indicate significant impairments in everyday life requiring accommodations through the ADA. Id. at ¶67. To evaluate an individual's need for accommodations, it is important to consider the level of impairment in day-to-day functioning and the reasonable expected need for accommodations based on that impairment. Id. It is important to outline what specific accommodations are being requested, the reasonableness of what can be offered and whether a disability or mental health diagnosis would account for self-reported challenges in completing a specific task. Id. at ¶68. Based on DeBlanc's review of records, interactions with the plaintiff, observations of his day-to-day functioning, the specific accommodations he requested and the perceived reason for said need, DeBlanc did not see a need for further testing. Id. at ¶69.

Inmates are provided information on how they may seek ADA accommodations. Id. at ¶70. The process does not involve contacting Dr.

Schmidt (the PSU supervisor) or a treating provider. Id. Schmidt's involvement with the plaintiff regarding his claim was limited to reviewing clinical notes prepared by the treating provider, which is a regular part of Schmidt's job duties. Id.

6. *DOC Legal Services Provision, DOC 309.155*

The Wisconsin Administrative Code, §DOC 309.155 provides in relevant part:

> (1) POLICY. It is the policy of the department to permit inmates reasonable access to the judicial process and to legal materials, and to afford a reasonable opportunity to prepare legal documents. Such access serves important rehabilitative goals and ensures effective procedures for raising and resolving complaints about institution practices and policies.
>
> (2) ACCESS TO COURTS. Inmates shall have access to courts and administrative agencies. Inmates' decisions to seek judicial or administrative relief shall not adversely affect their program, security classification or assignment to an institution.
>
> (3) ACCESS TO LEGAL MATERIALS. Each institution, except correctional centers and the Wisconsin resource center, shall maintain a law library and make legal materials available to inmates at reasonable times and for reasonable periods. Special provisions shall be made to provide access to legal materials for inmates with a special legal need and for inmates with a special need, such as illiteracy. The department may employ the use of current technology in providing access to legal materials.

Wis. Admin. Code §DOC 309.155.

7. *Disability Determination*

The defendants say that the plaintiff filed for "Disability" on August 18, 2011, claiming disability beginning on August 4, 2011. Id. at ¶105. They cite to Dkt. No. 76-1 at 2 in support of this assertion; the document is a March 2,

2015 decision by Administrative Law Judge William M. Zellman, finding that the plaintiff was not disabled for the purposes of Social Security disability benefits and supplemental security income. The decision says that the plaintiff applied for both disability and SSI and listed a disability onset date of August 4, 2011. Dkt No. 76-1 at 2. The decision recounts that both applications were denied, both initially and upon motion for reconsideration. Id. The plaintiff filed a written request for hearing on December 17, 2012. Id. According to the ALJ, the plaintiff was fully apprised of his right to retain counsel for the hearing but chose to proceed without an attorney or any other representative. Id.

The hearing, conducted by videoconference, started on July 1, 2014 and was continued to January 22, 2015. Id. The ALJ wrote that in the plaintiff's testimony, he "did not allege any debilitating physical or exertional impairments or limitations." Id. at 5. Instead, the plaintiff told the ALJ that he had a "longstanding impaired mental condition," emphasizing that "'being around people' is most difficult for him." Id. The ALJ noted that the plaintiff had not "been shown to be cognitively deficient, but has otherwise demonstrated recurrent difficulties in the area of control of emotions, stress management, social interaction, and rumination." Id. at 6. The agency psychologists had noted that the plaintiff "demonstrated moderate deficits in daily activities, socialization, concentration, persistence, and/or pace," but that he still could be considered capable of "performing the mental aspects of simple unskilled work, assuming symptom stabilization." Id. At Step 4, the ALJ concluded that the plaintiff had the residual functional capacity to perform a

20

full range of unskilled work with certain limitations. Id. at 7-8. Based on the vocational experts' testimony, the ALJ concluded that there were jobs in significant numbers in the national economy that the plaintiff could perform, and thus that he was not "disabled" for the purposes of getting Social Security benefits. Id. at 10.

### 8. *Inmate Complaints*

In responding to the plaintiff's offender complaints, ICE Muenchow reviewed information available to him at Waupun, spoke with the ADA coordinator, business office, educational director, "and or PSU/HSU" and made his decision based on his investigation and available information. Dkt. No. 69 at ¶73. One of the duties of the warden is reviewing and deciding inmate grievances/complaints, based on the investigation and recommendation of the ICE. Id. at ¶74.

On June 16, 2014, Muenchow received a complaint from the plaintiff regarding denial of a legal loan. Id. at ¶75. Muenchow reviewed Kamphuis' responses, disbursement requests and DAI Policy 309.55.01. Id. at ¶76. Muenchow summarized the facts as follows:

> I have reviewed the complaint submission as well as the relevant documents. The matter appears to be resolved in a simple manner, that being, the provision of proof a current legal need exists for which the copies are needed. From DAI P&P 309.51.01, "Even if an inmate is financially eligible, loan requests will be denied if:
> 1. An inmate fails to provide any requested supporting documentation of a current legal need.
> 2. The loan request is not for an appropriate purpose under Wisconsin Administrative Code s. DOC 309.51."
> The documents request could be related to a current legal need, or not, there is no way for the staff reviewing the request to know this and the onus is on the inmate to provide this information. Inmate

Murphy should follow the advisement of FPS Kamphuis and provide the proper supporting documentation related to the loan request. At this juncture, denial is appropriate.

Id. at ¶77. On September 3, 2014, Muenchow recommended dismissal of the plaintiff's complaint. Id. at ¶78. Warden William Pollard dismissed the complaint. Id.

On September 30, 2014, Muenchow received a complaint from the plaintiff regarding denial of an ADA request. Id. at ¶79. Muenchow reviewed two DOC-2530s submitted by the plaintiff and multiple documents from Kamphuis responding to those requests. Id. at ¶80. Muenchow summarized the facts as follows:

Inmate Murphy cites several exchanges with FPS Kamphuis regarding ADA requests. He has asked for extra Law Library time, permission to take personal notes to legal recreation periods, and the ability to bring a dictionary to legal recreation. The irony here, despite the fact he has been told numerous times by FPS Kamphuis he does not qualify for any type of ADA Accommodation, his support for the accommodation requests, i.e., the inability to write well, dyslexia, spelling problems, etc. is completely dismantled, if not through factual information provided by Education Director Reid, by the sheer number of well articulated correspondences to Ms. Kamphuis and through several complaint submissions here. FPS Kamphuis found no grounds for an accommodation and I concur. Further, Ms. Kamphuis has informed inmate Murphy some of what he requests can be fulfilled as a matter of practice related to Legal Recreation rules and Library Pass procedures. Lastly, inmate Murphy does not cite an urgent legal need or court deadline whereas extra Law Library time would be warranted.

Id. at ¶81. On November 15, 2014, Muenchow recommended dismissal of the plaintiff's complaint. Id. at ¶82. Deputy Warden Donald Strahota dismissed the complaint. Id.

On December 3, 2014, Muenchow received a complaint from the plaintiff complaining that his law library pass requests were not filled. Id. at ¶83. Muenchow consulted with Librarian Nevin Webster and learned that the reasons for the failure to fill the requests were that the plaintiff had failed to follow procedure regarding extra library time and that court deadline library passes are first come-first served and "can be full." Id. at ¶84. The plaintiff submitted a timely request for, and was granted, library time for the week of December 8, 2014. Id. On December 5, 2014, Muenchow recommended dismissal of the plaintiff's complaint. Id. at ¶85. Pollard dismissed the complaint. Id.

On December 22, 2014, Muenchow received a complaint from the plaintiff that he was denied a legal loan. Id. at ¶86. Muenchow consulted with Hartman and learned that the plaintiff's disbursement request did not contain sufficient information and clear documentation that the plaintiff's appointed attorney needed copies of documents from the plaintiff. Id. at ¶87. On April 27, 2015, Muenchow recommended dismissal of the plaintiff's legal loan complaint. Id. at ¶92. Pollard dismissed the complaint. Id.

On February 27, 2015, Muenchow received a complaint from the plaintiff that he had difficulty asking for ADA accommodations. Id. at ¶88. Muenchow provided information regarding the definition of a qualified inmate, told the plaintiff to contact Kamphuis and recommended denial of the complaint. Id. at ¶89. Again, Pollard dismissed the complaint. Id.

On April 7, 2015, Muenchow received a complaint from the plaintiff that he was denied a legal loan. Id. at ¶90. Muenchow learned that the plaintiff had submitted two requests for legal loan funds to Dane County Circuit Court, however he attempted to persuade Hartman[5] that the matter was related to an existing, approved legal loan for contacting the complaint examiner (CCE) in Madison. Id. In recommending dismissal of the complaint, Muenchow said that

> [i]nmate Murphy will have to show what legal need he has that would require him to contact the Dane County Circuit Court. At this point, it has nothing to do with contacting the CCE in DOC Central Office. If he wishes to take some matter that was a prior ICRS issue to court, he needs to present evidence to Ms. Hartman he has a case pending or a case to file with the particular court. He has not done this either. The denial was appropriate and any resulting sanction was brought upon inmate Murphy by his own actions.

Id. (citing Dkt. No. 71-1 at 77). On May 11, 2015, the CCE office accepted the plaintiff's late appeal and affirmed his complaint, noting the institution should review each request for legal loan and not enforce blanket denials. Id. at ¶93. The CCE Report states that on March 30, 2015 the plaintiff's access to all legal loans had been suspended for thirty days and that such a blanket denial was misguided because it did not allow an inmate meaningful access to the courts. Dkt. No. 71-1 at 80.

On April 21, 2015, Muenchow received another complaint regarding denial of ADA requests. Id. at ¶91. The complaint was rejected (which was affirmed by Pollard) because the issue already had been addressed and

---

[5] The defendants refer to "Kartman," but the court is not aware of anyone with that name being involved in this litigation, so it assumes the defendants meant "Hartman."

Kamphuis was not required to continue answering the same questions or requests. Id. Muenchow said that if the plaintiff had new information, he could provide that to Kamphuis. Id.

On June 10, 2015, July 15, 2015 and December 3 and 21, 2015, the plaintiff filed complaints regarding denial of ADA accommodations, which Muenchow and another ICE rejected. Id. at ¶94.

On February 29, 2016, the plaintiff filed a complaint against Kamphuis for failure to send DOC-2530 forms. Id. at ¶95. On March 1, 2016, ICE Bovee recommended dismissal, stating that

> [i]nvestigation reveals N. Kamphuis, Financial Program Supervisor, was contacted and indicated she has responded to the inmate numerous times regarding his request for an ADA Accommodation of a learning disability. Ms. Kamphuis responded to the inmate on 11/4/15, 11/27/15, 12/11/15, and 1/19/16 notifying him he is listed as having a low IQ, however, both PSU and HSU indicate he does not qualify for an accommodation. The inmate's concerns have been asked and answered at least four times and as such Ms. Kamphuis informed the inmate it would not be answered again and no additional forms would be sent to him for this request of an ADA Accommodation.
>
> Based on the facts as presented, I recommend this complaint be dismissed. There is no need for the inmate to continue taking up staff resources by continually filing the same request for accommodation.

Id. at ¶95; Dkt. No. 71-1 at 173. Warden Foster dismissed the complaint. Id.

On March 17, 2016, the plaintiff filed another inmate complaint regarding ADA rights, this time directed at the PSU. Id. at ¶97. ICE Bovee rejected the complaint, stating that

> [t]he issue raised in this complaint has been addressed through the inmate's prior use of the ICRS (DOC 310.11(5)(g), Wis. Adm. Code). This issue has been addressed in the following Complaints: 2014-

> 19273, 15-2701, 15-3868, 15-7366, 15-10394, 15-12728, 15-22599, 15-22964, 15-23805, and 15-4454. As such, it will not be revisited.

Id. Kevin Kallas affirmed the rejection. Id. at ¶98.

When reviewing inmate grievances, Warden Foster does not conduct any additional or independent investigation unless he decided that additional information is needed for him to make a decision. Id. at ¶99. Foster reviewed the information provided in the ICE recommendations regarding the plaintiff's offender complaints. Id. at ¶100. He decided that he did not need to conduct any additional investigation and relied on ICE information. Id.

## III.    Analysis

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits

or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

  B.   Discussion

    1.   *ADA and RA Claims*

To establish a violation of Title II of the ADA, "the plaintiff must prove that he is a 'qualified individual with a disability,' that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was 'by reason of' his disability." Wagoner v. Lemmon, 778 F.3d 586, 592 (7th Cir. 2015) (quoting Love v. Westville Corr. Ctr., 103 F.3d 558, 560 (7th Cir. 1996)); see also 42 U.S.C. §12132. Analysis under the ADA and the Rehabilitation Act is essentially the same, except that the Rehabilitation Act includes an additional element requiring that the entity denying access be a recipient of federal funds. Jaros v. Ill. Dep't of Corr., 684 F.3d 667, 671-72 (7th Cir. 2012). The relief available to the plaintiff under each Act is coextensive. Id. at 672; 42 U.S.C. §12133 ("The remedies, procedures, and the rights set forth in section 794a of Title 29 shall be the remedies, procedures,

27

and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."). "[B]ecause the ADA addresses its rules to employers, places of public accommodation, and other organizations, not to the employees or managers of these organizations," the proper defendant is Waupun; the individual defendants in their official capacities are proxies for the state and cannot be held personally liable. See Walker v. Snyder, 213 F.3d 344, 346 (7th Cir. 2000) (overruled on other grounds).

In their brief in support of summary judgment, the defendants contend that the plaintiff is not a "qualified individual with a disability" because his institution records do not demonstrate disabilities or unmet educational needs. Dkt. No. 68 at 15. The defendants argue that the plaintiff cannot prove that he is a qualified individual with a disability because

- he regularly worked on multiple civil and criminal cases in 2014 and 2015, and continued to do so as of the time the parties were briefing summary judgment;

- he communicated "volumes" to the PSU, resulting in a 725-page PSU file; based on a review of the plaintiff's education records and PSU files;

- Dr. DeBlanc determined that the plaintiff was not a qualified individual with a disability;

- the plaintiff represented himself at his Social Security hearings before the ALJ in what the defendants characterize as his ongoing efforts to obtain accommodations;

- the plaintiff filed multiple inmate complaints and Muenchow responded to one in September 2014 noting the "irony" of the plaintiff's requests for accommodation given the "sheer number of

well-articulated correspondences to Ms. Kamphuis and through several complaint submissions"; and

- the plaintiff has made repeated court filings in this case.

Id. at 15-16. The defendants assert that these facts demonstrate the plaintiff can read, write, communicate and prepare and file legal materials. Id. The defendants also contend that even if the plaintiff is a qualified individual with a disability, the defendants did not fail to accommodate him, because he has been provided adequate library time and materials to successfully communicate with the institution, the central office and the courts. Id. at 17.

In a thirty-three-page brief, the plaintiff argues that he is a qualified individual with a disability and that the defendants violated his rights by not providing him more time in the library. Dkt. No. 81 at 4, 9, 10 and 28. The plaintiff states that all his life he has had "visual sequencing and visual memory problems as well as auditory memory disorder." Id. at 20. He says that he has problems spelling and reading and that, because of his impairments, he can only copy one to two letters at a time "because I can't hold the spelling." Id. at 20-21. The plaintiff cites to several documents that he says support his assertion that he is a qualified individual with a disability under the ADA. For example, the plaintiff says he was diagnosed with a learning disorder as a child (1975, 1976, 1977); an October 12, 2011 Physician's Disability Report by Dr. Noah Horowitz diagnosed him with bipolar disorder, learning disorder and borderline personality order (dkt. no. 84 at 3-4); and a Psychiatric Review Technique document by Dr. Craig Childs dated February 29, 2012 indicates

that the plaintiff has a "learning disorder by history" (dkt. no. 106-1 at 28).

Dkt. No. 81 at 11-13. In addition, the plaintiff has submitted a June 4, 2018 letter from a law clerk at Disability Rights of Wisconsin to the Office of Legal Counsel (presumably of the Wisconsin Department of Corrections) stating that she had been working with the plaintiff to ensure that the DOC has documentation of the plaintiff's disability. Dkt. No. 106 at 91. The letter cites to the October 12, 2011 Physician's Disability Report and to Dr. Childs' Psychiatric Review Technique which "we believe are adequate to support the existence of Mr. Murphy's disability." Id.

> Under the ADA, the phrase "qualified individual with a disability" means
>
> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. §12131. The term "'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment [ ]." 42 U.S.C. §12102(1). Major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §12102(2)(A).

The definition of a disability "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted

by the terms of this chapter." 42 U.S.C. §12102(4)(A). To determine whether an impairment substantially limits a major life activity, the court may consider the condition, manner and duration of the plaintiff's ability to perform a major life activity, including consideration of difficulty, effort, or time required, pain experienced, the length of time activity can be performed and the way the impairment affects the operation of major bodily functions. 29 C.F.R. §1630.2(j)(4)(i)-(iii). "[T]he focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." 29 C.F.R. §1630.2(j)(4)(iii). The determination of whether someone's major life activity is substantially limited is made "without regard to the ameliorative effects of mitigating measures." 29 C.F.R. §1630.2(j)(1)(vi).

The plaintiff has raised a genuine issue as to the material fact of whether he has a disability. The record contains sufficient evidence to allow a reasonable factfinder to conclude that the plaintiff has a disability that substantially limits a major life activity. He says that he has a mental impairment that limits his ability to read, which is a major life activity, and medical professionals have diagnosed him with a learning disorder (albeit some time ago). Even defendant Kamphuis, in her November 3, 2013 memo to the plaintiff, stated that, "we're not saying you don't have a learning disorder." Dkt. No. 72-2 at 26. And while he has obtained an HSED and associate's degrees, and demonstrated his ability to file prison grievances and requests and to actively litigate this case, the plaintiff says that it requires a significant amount of extra effort to do so. <u>See</u> <u>Healy v. Nat. Bd. of Osteopathic Medical Exam'rs</u>,

870 F. Supp. 2d 607, 621 (S.D. Ind. 2012) (quoting <u>Bartlett v. New York State</u> <u>Bd. of Law Exam'rs</u>, 2001 WL 930792 at *7 (S.D. N.Y. 2001) (Sotomayor, J.) ("A definition of disability based on outcomes alone, particularly in the context of learning disability, would prevent a court from finding a disability in the case of any individual[.]")).

On the other hand, the record does not support a finding the defendants discriminated against the plaintiff based on a disability, or that he was denied the benefits of the services, programs or activities of a public entity. The plaintiff sought more time in the library; Kamphuis did not permit more time because she did not think he needed it. Notably, in making this determination, Kamphuis contacted the education director (Paul Ludvigson), the librarian and the educational guidance counselor, all of whom responded that they did not believe the plaintiff qualified for an accommodation, based on factors including his education, the lack of documentation supporting his request and the relative high quality (and number) of his requests and grievances. In addition, when the plaintiff continued to complain about not receiving accommodations, Dr. DeBlanc arranged a meeting with the plaintiff, DeBlanc and the ADA coordinator to assess his request for services, the feasibility of that request and the reason the plaintiff believed he needed accommodations. Far from showing that the defendants discriminated against the plaintiff, the record shows that the defendants, particularly Kamphuis and DeBlanc, went to lengths to address the plaintiff's concerns, although in the end they did not believe he had a disability warranting extra library time.

Not only has the plaintiff failed to demonstrate discrimination, he has failed to show that he was denied access to any program or service. The plaintiff had access to the library. The plaintiff has not alleged that he was prevented from accessing the library, or even that his time there was limited compared to other inmates. The plaintiff simply has argued that he wanted to spend *more* time there. Even though he wasn't allowed the extra library time, the plaintiff has been actively engaged in litigating this case since he filed it in 2016. He has filed hundreds of pages of documents that cite case law and argue persuasively in support of his claims. Even if the plaintiff has a learning disorder that qualifies as a disability under the ADA, he has not shown that he was prevented from accessing the library. An ADA violation exists only if the defendants' action or inaction prevents the plaintiff from participating in a program, activity or service. Holmes v. Godinez, 311 F.R.D. 177, 226 (N.D. Ill. 2015); Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) (no ADA claim because no discrimination alleged; no complaint of exclusion from prison service, program or activity). No reasonable factfinder could conclude that the plaintiff has stated a claim under the ADA or the Rehabilitation Act.

2.    *Access to the Courts Claim*

Prisoners have a constitutional right to meaningful access to the courts. See Bounds v. Smith, 430 U.S. 817, 821, 823 (1977); Lehn v. Holmes, 364 F.3d 862, 865-66 (7th Cir. 2004). But the right of access to the courts is not an unlimited one; it assures only "meaningful access to the courts." Id. at 866 (citing Bounds, 430 U.S. at 823). The right is "ancillary to the underlying claim,

without which a plaintiff cannot have suffered injury by being shut out of court." Id. (quoting Christopher v. Harbury, 536 U.S. 403, 415 (2002)). In other words, the right is limited by a prisoner's right to "vindication for a separate and distinct right to seek judicial relief for some wrong." Id. (quoting Harbury, 536 U.S. at 415); see also Lewis v. Casey, 518 U.S. 343 (1996)).

The plaintiff alleges that defendants Kamphuis, Muenchow and Hartman denied him access to the courts when they denied his requests for accommodations and a legal loan, resulting in his inability to petition the Wisconsin Supreme Court regarding his criminal case. See Dkt. No. 30 at 9. The defendants respond that the plaintiff was not denied access to the courts because, instead of filing a timely petition for review, he chose to file other motions with the court of appeals. Dkt. No. 68 at 19-20. The defendants also contend that, even if they prevented the plaintiff from filing the petition for review, the plaintiff did not suffer an "actual injury" because the court of appeals affirmed the judgment and determined there was no arguable merit to any issue that he could have raised on appeal. Id. at 21-22.

The plaintiff argues that the March 30, 2015 thirty-day blanket denial of his ability to obtain a legal loan prevented him from filing his petition for review. Dkt. No. 81 at 31. He says he had until April 23, 2015 to file his petition and that the misguided suspension of his legal loan prevented him from doing so. Id. at 32. The plaintiff states that the judge sentenced him to prison on "probation lies" and that he still remains in prison, so his court access has not been "too meaningful." Id. at 28. He also states that the "actual

injury was not getting to file the petition" about the State lying in the revocation summary given to the sentencing court. Id. at 32.

The thirty-day legal loan suspension could have prevented the plaintiff from timely filing a petition for review with the Wisconsin Supreme Court. The defendants, however, provide ample evidence to support the conclusion that the suspension did not prevent the plaintiff from accessing the court, and that the plaintiff is responsible for his inability to file a timely petition. In addition to the plaintiff's filing of a second motion for reconsideration instead of a timely petition for review, it is undisputed that the plaintiff's request for a legal loan did not include any deadline by which he was required to submit his petition for review. It is not clear whether, if he had provided a deadline as required, the plaintiff might have gotten a legal loan despite the thirty-day suspension.

The court need not resolve this issue because the plaintiff cannot show that he suffered an "actual injury" based on the defendants' actions. After the plaintiff's appointed appellate counsel filed a no-merit report under Wis. Stat. Rule 809.32, the court of appeals concluded that "the judgment may be summarily affirmed because there is no arguable merit to any issue that could be raised on appeal." Dkt. No. 77-2 at 1-2. The court's opinion describes that in 2000, the plaintiff was convicted of first-degree sexual assault of a child after entering a guilty plea to the allegation that he had sexual contact with his stepdaughter. Id. at 2. At sentencing, the plaintiff was placed on probation for twenty-five years and in 2013, his probation was revoked. Id. He was sentenced to twelve years' initial confinement and eight years' extended supervision with

1,542 days of sentence credit. Id. The court of appeals explained that "an appeal from a sentencing after revocation is limited to issues raised by the events of the resentencing hearing and the judgment entered as a result of that sentencing hearing; the appeal does not bring the original judgment of conviction before the court." Id. The court stated that the no-merit report discussed the sentencing court's exercise of discretion and "[w]e agree with the report's conclusion that there is no arguable merit to a claim that the court erroneously exercised its discretion at sentencing or imposed a sentence that was excessive." Id.

Next, the court of appeals addressed the fact that the revocation summary provided to the sentencing court listed eight alleged violations of the conditions of probation, but at the revocation hearing the administrative law judge found three of the allegations unfounded. Id. The court determined that no issue of arguable merit arose from including the unproven probation violations in the revocation summary because the plaintiff's attorney had informed the court that the three allegations were not proven at the revocation hearing and because, just as the sentencing court may consider unproven offenses at sentencing, it may consider unproven allegations of probation violations. Id. at 2-3. The court of appeals also addressed the plaintiff's contention that his sentencing counsel was ineffective for not objecting to information in the revocation summary that was given during sex offender treatment group or to his agent as part of his sex offender treatment requirements. Id. at 3.

The court of appeals stated that the plaintiff's principle concern in response to the no-merit report was his belief that he was sentenced on inaccurate information about the nature of the offense. Id. at 4. The plaintiff had argued that while the criminal complaint had alleged that he had pushed his penis "onto" the child's vagina, the revocation summary alleged that he had started to push his penis "into" the child's vagina. Id. The court determined that there was no merit to the plaintiff's contention that the sentencing court relied on the "into" characterization of the offense in the summary revocation. Id. at 5.

> The court specifically stated it relied on the information in the criminal complaint and PSI with respect to the offense, both of which used the word "onto" to describe the offense. Although the sentencing court used the "into" word when describing the offense, it was nothing more than a misstatement in light of the court's explicit reliance on the complaint and PSI description. Moreover, the crime was fully committed by Murphy's rubbing action, something he admitted. If any distinction can be drawn between "onto" and "into," it has no significance in this case because it was not relied on. The court would have assessed the loathsome nature of the crime the same regardless of which version of the offense description was factually accurate. Its assessment of the severity of the crime was driven by Murphy's status as a father figure for the child.

Id. at 5-6.

The court also recounted the sentencing judge's discussion of the seriousness of the crime in terms of today's crime known as first-degree sexual assault of a child by sexual intercourse with a child under the age of twelve under Wis. Stat. §948.02(1)(b). Id. at 6. The court concluded that its determination that there was no merit to a claim that the sentence was based on inaccurate information did not change because of the sentencing court's

discussion of §948.02(1)(b). It reasoned that the sentencing court's reference to penetration, however slight, illustrated that

> under the facts of the case there was no distinction between characterizing the post-rubbing conduct as 'onto' or into.' Rubbing 'onto' to the point of causing the victim pain can be equated with penetration, however slight. So even if the court used 'into' or otherwise equated Murphy's conduct with slight penetration, it was not an inaccurate assessment of the nature of the crime.

Id. at 6-7.

To establish an "actual injury," the plaintiff needs to present evidence demonstrating that he was prevented from pursuing a nonfrivolous, or potentially meritorious, legal action. See Harbury, 536 U.S. at 414-15; Ortiz v. Downey, 561 F.3d 664, 671 (7th Cir. 2009). The plaintiff claims that the State lied to the judge and made up evidence, and that the defendants' preventing him from filing his petition "is actual injury." Dkt. No. 81 at 33. But the court of appeals thoroughly addressed the plaintiff's arguments and found that there was no arguable merit to any issue the plaintiff could raise on appeal, and the plaintiff has not presented proof that his claim has merit. See Love v. Scaife, 586 F. App'x 234, 236 (7th Cir. 2014) (at summary judgment, plaintiff compelled to present evidence that could convince a trier of fact that his post-conviction appeal raised arguable issues). The plaintiff's access-to-the-courts claim fails because he has not shown that the alleged lack of access caused him actual injury. See id. (citing Lewis, 518 U.S. at 349); see also Harbury, 536 U.S. at 416 ("[T]he predicate claim [must] be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope."). The court will grant the defendants' motion for

38

summary judgment, and deny the plaintiff's motion as to his access to the courts claim.

### III.    Plaintiff's Motion for the Status of the Case (Dkt. No. 107)

The court received the plaintiff's request for information about the status of his case. Dkt. No. 107. The court regrets the time it has taken the court to issue this decision, but its issuance moots the plaintiff's motion.

### IV.    Conclusion

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 60.

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 67.

The court **DENIES** the plaintiff's motion to compel discovery. Dkt. No. 94.

The court **DENIES AS MOOT** the plaintiff's motion for the status of the case. Dkt. No. 107.

The court **ORDERS** that this case is **DISMISSED** and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 31st day of March, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**